IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| HH ASSOCIATES, U.S., INC., as successor to INNER WORKINGS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> RAYMOND EVANS, <br><br><br> Defendant. | CIV. NO. 22-00062 JAO-KJM <br><br> ORDER GRANTING PLAINTIFF'S MOTION TO STRIKE AND EXCLUDE (ECF NO. 31), GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO EXCLUDE (ECF NO. 32) AND DENYING DEFENDANT'S MOTION TO EXCLUDE (ECF NO. 46) |

**<u>ORDER GRANTING PLAINTIFF'S MOTION TO STRIKE AND
EXCLUDE (ECF NO. 31), GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION TO EXCLUDE (ECF NO. 32) AND DENYING
DEFENDANT'S MOTION TO EXCLUDE (ECF NO. 46)</u>**

Before the Court are three motions to exclude expert testimony in this civil

proceeding involving claims for breach of fiduciary duty, breach of contract,

violation of state and federal trade secrets laws, tortious interference with existing

and prospective business relationships, and civil conspiracy.  Following discovery,

each party filed motions to strike or exclude the opposing party's experts, *see* ECF

Nos. 31, 32, 46, under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

579 (1993).  For the following reasons, the Court GRANTS Plaintiff IW's Motion

Strike and Exclude Expert Testimony of James A. Anderson (ECF No. 31);

GRANTS in part and DENIES in part IW's Motion to Exclude Expert Testimony of Briggs Stahl (ECF No. 32); and DENIES Defendant Evans' Motion to Exclude Expert Opinion of Jesse A. Ultz (ECF No. 46).

## I.    BACKGROUND

### A.    Factual Background[1]

Because the parties are familiar with the underlying facts, the Court provides only a brief and simplified overview of the relevant allegations.  This case involves allegations by Plaintiff HH Associates, U.S., Inc., as successor to Inner Workings, Inc. (hereafter, "IW" or "Plaintiff")[2] against defendant and former employee Raymond Evans ("Evans" or "Defendant") regarding actions that Evans took leading up to his departure from IW in February 2020.

Evans was responsible for servicing IW's clients in Hawaiʻi and Guam as well as managing other IW sales representatives in the state.  ECF No. 28 ¶ 3.  In December of 2019, Evans met with Sarah Horn, former Vice President of

---

[1] Unless otherwise noted, the below facts are undisputed.  These facts originate with allegations and admissions from the Complaint and Answer, *see* ECF Nos. 1, 20, or from the parties' Statements of Facts submitted in relation to IW's Motion for Summary Judgment, *see* ECF Nos. 28, 63.

[2] According to the Complaint, InnerWorkings merged into HH Associates in December 2021, ECF No. 1 ¶ 15, and Evans does not appear to presently dispute this allegation, ECF No. 63 at 2 n.1.  As both parties refer to Plaintiff as "IW" in briefing, the Court also uses "IW" rather than "HH" to refer to Plaintiff.

Operations at IW, who had resigned and joined competitor Smart Source, LLC ("Smart Source) in August 2019.  ECF No. 1 ¶ 38; ECF No. 28 ¶¶ 7–8, 12; ECF No. 63 ¶ 56.  By late January 2020, Smart Source extended offer letters to all seven of IW's Hawaiʻi-based sales representatives, including Evans.  ECF No. 28 ¶ 23; ECF Nos. 28-34, 28-35, 28-36, 28-37.  On February 14, 2020, Evans and three other IW employees resigned, *see* ECF No. 63 ¶ 59, and became employees of Smart Source on February 17, 2020, *see* ECF No. 28 ¶ 32.  Following the departure, upwards of 80% of IW's customers left for Smart Source.  ECF No. 28 ¶ 36; ECF No. 63 ¶ 36.

## B.    The Expert Reports

The parties exchanged reports from three individuals that all provide opinions on the damages IW seeks as a remedy for its claims against Evans. Plaintiff engaged the services of Jesse A. Ultz, while Defendant obtained reports from James A. Anderson and Briggs Stahl.

### 1.    Plaintiff's Expert Report

IW produced a June 2023 report from Jesse A. Ultz that determines the fair market value ("FMV") of IW's Hawaiʻi-based business as of February 14, 2020— the date Evans and three other IW sales representatives resigned.  ECF No. 46-2 at 5.  Ultz used a capitalized cash flow method to estimate the "enterprise value" of IW's business in Hawaiʻi.  *Id*. at 6.  The enterprise value is reached by calculating

"the total invested capital of an enterprise, including common and preferred equity,

interest-bearing debt, and noncontrolling interests, net of cash and cash

equivalents." *Id*. Finally, the report adjusts the enterprise value by considering

outstanding interest-bearing debt to arrive at the FMV. *Id.* at 15. Ultz noted that

discussions with IW management—and their belief that "2019 represented an

inflection point"—led to a "long-term growth rate of 3.0%" in IW's estimated

sustainable EBITDA (earnings before interest, taxes, depreciation, and

amortization). *Id*. at 10. The capitalized cash flow method resulted in an

enterprise value of $5.57 million, and a FMV of the same value. *Id*. at 14. Ultz

testified that his valuation "valued the business that existed on February 14, 2020"

and noted that the valuation determined the value for which "[a] buyer would have

purchased that business and all of its assets, including its employees." ECF No.

46-11 at 24–25.

### 2. Defendant's Expert Reports

Evans produced expert reports from James A. Anderson, and Briggs Stahl.[3]

These reports highlight perceived shortcomings from Ultz's report and testimony.

Anderson's report emphasizes that the Ultz report "fail[ed] to consider industry

---

[3] Stahl's reports were co-authored by his colleague Jimmy Stewart. ECF No. 32-4 at 1; ECF No. 32-5 at 1. However, Stahl sat for a deposition, and the parties do not mention Stewart. ECF Nos. 32, 32-6, 65, 70. For simplicity, the Court therefore refers to these reports as the Stahl reports.

factors," did not take into account certain IW actions in 2019 related to its Hawaiʻi sales operation, and did not look at "back-end earnout" that would have occurred "over the course of potentially several years" following any sale of the company. ECF No. 31-4 at 3–7, 9.  Anderson opined that IW's Hawaiʻi sales did not constitute a separate "division" or "business unit" in IW, and that Ultz's use of EBITDA was improper for "valuing a group of sales representatives," stating that printing industry companies would use "percentage of sales, a multiple of gross profit or any one of a number of other alternative valuation metrics."  *Id.* at 7–9.

The Stahl opinions lodge similar attacks on the Ultz report.  Stahl's reports state that "the use of a purported 4-6x EBITDA multiple . . . is speculative, unreliable, and lacks relevance."  ECF No. 32-4 at 3.  Stahl characterized the 4-6x multiple as an overstatement, claimed the methodology employed by Ultz "is not grounded in reliable business valuation principles or methodologies," and noted Ultz did not account for IW's financial decline between 2015 and 2019 or for the COVID-19 pandemic.  *Id*. at 17-21; ECF No. 32-5 at 22–25.  Stahl also claims the discount figure from Ultz's report is too low, thereby overstating the value of IW's Hawaiʻi operations.  ECF No. 32-5 at 17–22.  Finally, Stahl's reports seek to discredit the underlying data from IW's EBIDTA figure, noting the spreadsheet provided by IW previously "provided vastly different figures . . . due to errors and omissions" across three earlier iterations, and was therefore unreliable.  *Id*. at 23.

## C.    Procedural History

IW filed its Complaint in February 2022, and Evans filed an Answer in June.
ECF Nos. 1, 20.  The Complaint brings six claims for breach of fiduciary duty of
loyalty, breach of contract, violation of federal and state trade secrets laws, tortious
interference with existing and prospective business relationships, and civil
conspiracy.  In the background of this case is a pending lawsuit in the Middle
District of Florida, brought by Plaintiff against Evans' alleged coconspirators Horn
and Smart Source, *Innerworkings Inc. v. Horn, et al.*, 8:21-CV-903 (M.D. Fla.)
(the "Florida litigation").  In the instant motions, both parties moved to strike the
opposing party's expert reports and testimony.  The Court held a hearing on these
and several other pending motions on January 5, 2024.  ECF No. 82.  The parties
filed supplemental briefs on January 22, 2024.  ECF Nos. 88, 89.

## II.    LEGAL STANDARD

Federal Rule of Evidence ("FRE") 702 governs the admissibility of expert
testimony.  *See Clausen v. M/V New Carissa*, 339 F.3d 1049, 1055 (9th Cir. 2003).
Experts may offer opinions based on their "knowledge, skill, experience, training,
or education" if the following requirements are met:

> (a) the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the evidence
> or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The admissibility standard embodied by FRE 702 is flexible and should be applied with a liberal thrust favoring admission.  *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017).

In *Daubert*, the Supreme Court focused on the admissibility of scientific expert testimony, clarifying that FRE 702 controls the admissibility of such testimony through the conventional relevancy and reliability standards.  509 U.S. at 589.  Scientific expert testimony—like all other expert testimony—is relevant if it has a valid connection to the pertinent inquiry and is reliable if the methodology underlying it has a reliable basis in the knowledge and experience of the relevant discipline.  *See id.* at 591–92; *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).  The burden of proving relevancy and reliability rests with the proponent of the expert testimony.  *Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).  Notwithstanding that burden of proof, district courts have their own duty to ensure the reliability and relevancy of all expert testimony submitted to a jury.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148–49 (1999) (describing the "gatekeeping obligation" of district courts).

When assessing reliability, district courts have broad latitude in choosing their methods of assessment. *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004). *Daubert* outlines the following nonexclusive factors that may bear on determining the reliability of a particular scientific theory or technique: "(1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the applicable scientific community." *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017).

"'The focus of the district court's analysis must be solely on principles and methodology, not on the conclusions that they generate,' and 'the court's task is to analyze not what the experts say, but what basis they have for saying it.'" *Grodzitsky*, 957 F.3d at 984–85 (citation omitted); *see also Daubert*, 509 U.S. at 592–93. The district court's function is to "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). "A district court may permissibly choose not to examine [the particular *Daubert*] factors that are not 'reasonable measures of reliability in a particular case.'" *Murray*, 870 F.3d at 922 (quoting *Kumho*, 526 U.S. at 153). And a district court may, of course, consider other factors pertinent to the

reliability inquiry in a particular case.  *See id.* at 924 (citing *Black v. Food Lion, Inc.*, 171 F.3d 308, 311–12 (5th Cir. 1999)).

"[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) (citing *Daubert*, 509 U.S. at 591–92).  That is, "[t]he evidence must logically advance a material aspect of the party's case." *Id.* (citing *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995)).  The district court "is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car*, 738 F.3d at 969–70.  A court's gatekeeping inquiry "must be tied to the facts of a particular case." *Cooper*, 510 F.3d at 942 (some internal quotation marks and citations omitted).

## III.   DISCUSSION

### A.   Measure of Damages & Plaintiff's Motion to Exclude Ultz Report

#### 1.   Threshold Issue on Measure of Damages

Both IW and Evans seek to preclude the opposing party's expert testimony in part because of a fundamental disagreement about the proper measure of damages applicable to this case.  IW contends that Evans (along with non-party coconspirators Sara Horn and Smart Source, defendants in the Florida litigation) "destroyed [IW's] Hawai'i business" and IW therefore should be permitted to

recover "the value of its Hawaiʻi business as of February 14, 2020," the date of Evans' and several other employees' departures.  ECF No. 31-1 at 8.  IW's expert report from Ultz therefore offers an opinion that provides the FMV for IW's Hawaiʻi operations as of February 14, 2020.  ECF No. 31-3.

Evans, on the other hand, disagrees factually that IW's Hawaiʻi business was destroyed, asserting that "IW maintained other employees in Hawaiʻi and continued to generate new sales in Hawaiʻi through 2022."  ECF No. 46 at 10–11. Evans also argues that IW's conception of its "Hawaiʻi business" constitutes a fallacy because it was not a separate business, but merely a "segment of [IW's] middle market business."  ECF No. 46 at 16.  Thus, Evans' expert reports from both Anderson and Stahl seek to rebut Ultz in part by attacking the soundness of using a business valuation to measure IW's damages.  Anderson claims that "any potential interest" in IW's Hawaiʻi operations would have instead considered "past and present revenue performance," "sales revenue," or "a multiple of gross profit," ECF No. 31-4 at 6, 8; and Stahl states that Ultz's methodology "fails to consider key facts" because IW "retained approximately 32 of its 170 Hawaiʻi-based customers."  ECF No. 32-5 at 28.

Following the motions hearing in early January, the Court ordered—and the parties submitted—supplemental briefing on the proper measure of damages and divisibility of damages.  ECF Nos. 81, 88, 89.  The parties agree on the following:

(1) Illinois law governs the breach of contract claim,[4] and (2) Hawaiʻi state law governs the claims for breach of fiduciary duty of loyalty, violation of the state trade secrets statute, tortious interference with existing and prospective business relationships, and civil conspiracy.  ECF No. 88 at 11–13; ECF No. 89 at 6–8. Thereafter, the parties largely retreat to their respective corners—IW claims its total destruction theory (and therefore the FMV model from its proffered expert) constitutes an acceptable measure of damages regardless of the jurisdiction, ECF No. 88 at 13–24, and Evans argues both that the total destruction theory is not recognized in Hawaiʻi and that IW was not destroyed in any event, ECF No. 89 at 8–17.

At this juncture, the Court disagrees with Evans' claim that because "Hawaii does not have a comparable law that permits the recovery of the [FMV] of a business," IW necessarily cannot rely on a FMV damages theory or submit it to a jury.  *See* ECF No. 46 at 20; ECF No. 89 at 8–11.  IW's claims include both breach of contract and tort claims.  In Hawaiʻi, contract and tort claims require damages to be proven "with reasonable certainty."  *First Hawaiian Bank v. Bartel*, 2009 WL 10676756, at *12 (D. Haw. May 22, 2009) (quoting *Uyemura v. Wick*, 57 Haw.

---

[4] IW's supplementary brief indicates it also alternatively claims Evans breached an oral confidentiality agreement and such a claim would be analyzed pursuant to Hawaiʻi law.  ECF No. 88 at 12.

102, 111, 551 P.2d 171, 177 (Haw. 1976) (contract)); *Exotics Hawaii-Kona, Inc. v. E.I. Du Pont De Nemours & Co.*, 116 Hawaiʻi 277, 292, 172 P.3d 1021, 1036 (2007) (citing *Weinberg v. Mauch,* 78 Hawaiʻi 40, 50, 890 P.2d 277, 287 (1995) (tort)).  But "the law never insists upon a higher degree of certainty as to the amount of damages than the nature of the case admits."  *Kalima v. State*, 148 Hawaiʻi 129, 143, 468 P.3d 143, 157 (2020) (quoting *Coney v. Lihue Plantation Co.*, 39 Haw. 129, 139 (Terr. 1951)).  Particularly when uncertainty in damages approximation arises through no fault of the plaintiff, courts in Hawaiʻi may permit juries to "to form, under proper instructions from the court, such reasonable and probable estimate, as in the exercise of good sense and sound judgment they shall think will produce adequate compensation."  *Coney*, 39 Haw. at 138.  Thus, where "the fact of damage is established, a more liberal rule is allowed in determining the amount."  *Id*. at 139.

The "nature of the case" here involves multiple claims recoverable in tort and contract, *see Kalima*, 468 P.3d at 157, based on allegations that Evans successfully conspired with Smart Source employees to "steal [IW]'s business in Hawaiʻi" leading up to his February 2020 departure.  ECF No. 1 ¶ 1.  Evans points to no statute, rule, or case that would forbid IW from pursuing a theory that permits recovery of the FMV of IW's operations in Hawaiʻi.  There is also no suggestion that the uncertainty here resulted from IW's actions—thus, IW may argue to the

12

jury a "reasonable and probable estimate" of its damages.  *See Coney*, 39 Haw. at 138.  Given the nature of the instant suit, and assuming IW can establish the fact of its damages, the Court concludes that IW's FMV theory constitutes a permissible method by which to calculate "adequate compensation."  *Id.* at 138, 139.

In addition to the Hawai'i cases that permit a reasonable and probable estimation of damages, California caselaw provides helpful guidance, as courts in Hawai'i often look to California for precedent on issues where Hawaii's precedent is lacking.  *See Great Divide Ins. Co. v. AOAO Maluna Kai Ests.*, 492 F. Supp. 2d 1216, 1227 (D. Haw. 2007) (citing *Locricchio v. Legal Servs. Corp.*, 833 F.2d 1352, 1357 (9th Cir. 1987); *Sutherland v. Kaonohi Ohana, Ltd.*, 776 F.2d 1425, 1427 n.4 (9th Cir. 1985)).  In applying California law, the Ninth Circuit affirmed the admissibility of expert testimony using "enterprise valuation theory[5] . . . based on loss of business value," stating it was grounded in "an accepted methodology of

---

[5] The Court understands enterprise valuation as part and parcel of the FMV, as the Ultz report calculated enterprise value before making adjustments to arrive at the FMV.  *See* ECF No. 46-2 at 5, 6, 15, 16.  Scholarly articles on business litigation echo that "enterprise valuation . . . involves determining the value of an ongoing business."  Robert M. Lloyd, *Discounting Lost Profits in Business Litigation: What Every Lawyer and Judge Needs to Know*, 9 Transactions: Tenn. J. Bus. L. 9, 23 (2007); *see also* Kenneth M. Kolaski, Esquire, CPA & Mark Kuga, Ph.D., *Measuring Commercial Damages Via Lost Profits or Loss of Business Value: Are These Measures Redundant or Distinguishable?*, 18 J.L. & Com. 1, 5 (1998) (discussing methods to calculate the "value of a business enterprise" in relation to measuring loss of business value damages).

business valuation." *GATX/Airlog Co. v. Evergreen Int'l Airlines Inc.*, 52 F. App'x 940, 942 (9th Cir. 2002). And a California federal district court rejected a defendant's argument that "only lost profits damages, not business value damages, are recoverable in California," noting defendant would be "free to put forth evidence at trial showing it did not cause the destruction of [p]laintiff's business." *See Alpha GRP, Inc. v. Subaru of Am., Inc.*, 2021 WL 1146029, at *8 (C.D. Cal. Feb. 8, 2021); *see also Base Media Tech. Grp. Ltd. v. Chase*, 2023 WL 4316782, at *10 (C.D. Cal. June 9, 2023) (permitting "award based on the loss in value of the business" under California law). Evans, similarly, will be free to argue he was not the cause of IW's business losses in Hawaiʻi.

Finally, Evans also insists that IW should be forbidden from using the FMV damages model because "IW was not totally destroyed," ECF No. 89 at 11, and IW maintains that any additional revenue after February 14, 2020 constituted "de minimis trailing revenue," ECF No. 61 at 19. Because IW moved for summary judgment on liability only, and indeed, the summary judgment litigation revealed disputed facts related to the destruction of IW's business, *see* ECF No. 28 ¶ 36; ECF No. 63 ¶ 36, the Court concludes that whether IW's Hawaiʻi business was destroyed is a question of fact for the jury to assess at trial.

For all of the above reasons, the Court DENIES without prejudice the portions of Evans' *Daubert* motion that are premised on the use of an allegedly inapplicable or irrelevant damages model in Utz's report.

### 2.    Defendant's Motion to Strike Ultz Report

Evans claims Ultz's report and testimony should be excluded because Ultz: (1) used a total destruction damages model which is not recognized in Hawai'i; (2) incorrectly assumed IW's business was destroyed; (3) relied on calculations for HH Global rather than for IW; (4) used a 3% growth rate and wrong valuation date; and (5) disregarded data regarding the COVID-19 pandemic.  ECF No. 46. The Court has already concluded that IW's damages model is acceptable and appropriate given its damages theory, and whether IW's business was destroyed will be for the jury to decide.  The Court therefore turns to the remaining perceived faults in the Ultz report.

Rule 702 requires that an expert opinion must be founded on, *inter alia*, "sufficient facts or data."  Fed. R. Evid. 702.  Sufficient facts or data are required so that the expert's opinion is "more than subjective belief or unsupported speculation."  *See Daubert*, 509 U.S. at 590.  "The court's role is to determine  'the scientific validity' of an expert's 'principles and methodology,' not to determine whether their hypothesis is correct, or to evaluate whether it is corroborated by other evidence on the record."  *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017,

1026 (9th Cir. 2022) (quoting *Daubert*, 509 U.S. at 594-95). In other words, Rule 702's 'sufficient facts or data' element requires foundation, not corroboration." *Id.* at 1025 (quoting Fed. R. Evid. 702).

Evans claims that Ultz's opinion is not reliable because it uses a figure derived from HH Global to estimate IW's overhead expenses in Hawaiʻi during the relevant timeframe. ECF No. 46 at 27-29. Evans argues it was speculative to use these numbers because HH's expenses were not "known or knowable" on the valuation date and using HH's expenses doesn't necessarily translate to costs that IW incurred. *Id.* Relying on deposition testimony from a former IW employee and from Ultz, IW counters that HH Global's average central support costs from 2020-2022 were used as a proxy to estimate IW's overhead because IW did not track these costs during the relevant timeframe. ECF No. 61 at 21-23.

The Court concludes that Ultz's use of HH Global's central support costs goes to the weight rather than admissibility of his opinion. *See Alaska Rent-A-Car,*, 738 F.3d at 970 ("Avis challenges three aspects of the witnesses['] testimony: using Alamo as the comparator, using the national rather than the Alaska market as a baseline, and extrapolating from the Juneau market to the entire Alaska market. . . . [Those challenges] all go to the weight of the testimony and its credibility, not its admissibility."). Evans may cross-examine Ultz regarding his use of HH Global's costs to estimate IW's costs. The Court agrees with IW,

16

however, that IW's costs were *knowable* on the proposed valuation date of
February 14, 2020—such costs simply were not retrievable for purposes of this
litigation.  Thus, using an estimate based off the successor-in-interest to IW,
calculated over a three-year average, does not render Ultz's opinion speculative.
*See Packgen v. Berry Plastics Corp.*, 847 F.3d 80, 88 (1st Cir. 2017) (citing *Alaska
Rent-A-Car*, 738 F.3d at 970) (characterizing "compar[ing] the unknown to an
analogous known experience" as "a proper methodology").

The Court concludes the same for Ultz's conclusions regarding IW's growth
rate, valuation date, and the impact of COVID-19.  Ultz testified that his 3%
growth rate estimate considered both interviews with IW management as well as
the projected growth for several public companies, whose estimates were "well
above" the inflation-matching rate he used in his analysis.  ECF No. 61-30 at 17–
19.  Ultz's approach satisfies the Ninth Circuit's pronouncement that "foundation,
not corroboration" is required for sufficient facts or data.  *See Elosu*, 26 F.4th at
1025.  So does a valuation date of February 14, 2020; this is undisputedly the date
that Evans left IW's employ—allegedly taking IW's customers and his coworkers
along too.  Finally, the Court rejects Evans' claim that Ultz ignored known or
knowable information about the COVID-19 pandemic, as this argument relies on
the purported impropriety of Ultz's valuation date.  ECF No. 46 at 31–33.

In sum, Evans' concerns with Ultz speak to the weight of his report and opinion, not their admissibility.  Ultz's report relies on sufficient facts and data under Rule 702.  Evans may cross-examine Ultz on these topics at trial.  The Court DENIES Evans' motion to exclude Ultz's opinion.

## B.    Plaintiff's Motion to Strike and Exclude Anderson Report

IW attacks Anderson on multiple bases, principally arguing that Anderson's report and testimony should be excluded because Anderson: (1) failed to identify all of the facts and data he considered in preparing his report pursuant to Rule 26(a)(2)(B)(ii); and (2) does not satisfy Rule 702 or *Daubert*.  ECF No. 31-1.

### 1.    Rule 26(a)(2)(B)(ii)

Rule 26(a)(2) of the Federal Rules of Civil Procedure governs the disclosure of expert testimony, states that the written report of an expert witness must contain, *inter alia*, "the facts or data considered by the witness in forming them."  Fed. R. Civ. P. 26(a)(2)(B)(ii).  Rule 26 disclosure obligations are enforced by Rule 37(c), which "gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed."  *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2011) (quoting *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)).

IW focuses on Exhibit B of Anderson's report—the report claims Exhibit B lists "documents and information considered" by Anderson in generating his report.  ECF No. 31-4 at 3.  Exhibit B lists only the Ultz report as source material.  *Id*. at 13.  In deposition, however, Anderson acknowledged that he relied on additional documentation to arrive at his conclusions, including the Amended Complaint; certain of IW's interrogatory responses; a 2020 report Anderson authored on the HH Global-IW transaction; deposition testimony; a spreadsheet detailing IW's earnings; and IW's public company filings.  ECF No. 31-1 at 9–10.  Evans responds that the Anderson report footnoted the Amended Complaint and interrogatories as source material, that the spreadsheet constituted "the same data on which Ultz relied," and exclusion is not warranted merely because "Anderson did not separately list" them in Exhibit B.  ECF No. 64 at 16–17.  Evans fails to respond to IW's arguments concerning Anderson's use of his 2020 report; deposition testimony; or IW's public company filings.[6]  *Id*.

---

[6] IW is incorrect that Anderson admitted to relying on IW's public company filings to generate his March 2023 expert report for this case.  Anderson testified that his 2020 report regarding the HH Global-IW transaction "was based on 10-K and 10-Q filings" and that the 2020 report was made available "to the general public."  ECF No. 31-5 at 83–85.  Anderson confirmed he reviewed these SEC filings to prepare the 2020 report.  *Id*. at 86.  Anderson did not testify that he relied on the SEC filings for the March 2023 Anderson report at issue in this litigation, and the Court does not consider these documents in its Rule 26 or reliability analysis.

According to Rule 37(c), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial." Fed. R. Civ. P. 37(c)(1).  Rule 37(c)(1) contains two exceptions: if the party's failure to make a Rule 26(a) disclosure is either "substantially justified or harmless," exclusion is not required.  *Id.*  "In addition to or instead of" the exclusionary sanction, the court may: order payment of reasonable expenses, including attorney's fees, caused by the failure; inform the jury of the party's failure; and impose other appropriate sanctions, including those for disobeying a discovery order.  Fed. R. Civ. P. 37(c)(1).

The Ninth Circuit "give[s] particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1)."  *Yeti*, 259 F.3d at 1106 (citation omitted).  Rule 37(c)(1) is described as a "'self-executing,' 'automatic' sanction to 'provide[ ] a strong inducement for disclosure of material.'"  *Id.* (alteration in original) (citation omitted).  Bad faith or willfulness are not required to impose sanctions under this rule.  *See id.*  The two exceptions contained in FRCP 37(c)(1)—substantial justification and harmlessness—"ameliorate the harshness" of the rule.  *Id.*  The burden to prove substantial justification or harmlessness rests with the party facing sanctions.  *Yeti*, 259 F.3d at 1107.  "For purposes of Rule 37(c)(1), a party's failure to disclose is substantially justified where the non-

20

moving party has a reasonable basis in law and fact, and where there exists a genuine dispute concerning compliance." *Suzuki v. Helicopter Consultants of Maui, Inc.*, 2016 WL 3753079, at *7 (D. Haw. July 8, 2016) (citation omitted). "Failure to comply with the mandate of the Rule is harmless when there is no prejudice to the party entitled to the disclosure." *Id. (citation omitted).*

Having reviewed the Anderson report, deposition, and the parties' briefing on this issue, the Court concludes that Rule 37 sanctions are warranted.  Evans does not dispute that Anderson relied on but failed to disclose in his report: a 2020 report he authored on the HH Global-IW transaction; deposition testimony from this litigation; and a spreadsheet detailing IW's earnings.  ECF No. 64 at 15–17. The report, for example, states Anderson's opinions "are based upon an independent assessment of the documents and information available to me as of the time of this report; conversations had with counsel and Smart Source representatives; my general knowledge and experience; and any research and analysis I deemed appropriate," and refers the reader to Exhibit B.  ECF No. 31-4 at 3.  But Exhibit B lists only the Ultz report, and Anderson's report does not provide citations to any particular document other than the Ultz report he seeks to rebut. *See generally* ECF No. 34-1.

Anderson testified that he considered "a variety of reports" in addition to the Ultz report to author his rebuttal.  ECF No. 31-5 at 75.  That included "the data that

Mr. Ultz looked at and relied on," including the spreadsheet of IW earnings, even though Anderson stated such data "obviously" was not identified as a document he considered.  *Id*. at 76-78.  Anderson stated that "research and analysis" included a 2020 report he authored about the HH Global-IW transaction, stating the 2020 report "has nothing to do with my expert report necessarily *except that I used that report and that information to create the expert report for this case*."  *Id*. at 84–85 (emphasis added).  Anderson also stated that he "read some depositions" to prepare his report, including Sara Horn's, but acknowledged he did not identify this deposition anywhere in his report.  *Id*. at 106.  Anderson further stated that certain names, such as Colin Henry, Mike Wagner, and Ron Provenzano, were "familiar to [him] from this case" but could not recall whether he reviewed their deposition transcripts.  *Id*. at 112.  Finally, when asked if there were "any other documents or information you considered that we have not already gone over today that you did not identify in the report," Anderson answered: "Most likely."  *Id*. at 114.

Evans does not address these deficiencies in his opposition, and does not answer the question of whether these Rule 26 violations were substantially harmless or justified.  The Court concludes Evans has waived his argument on this issue.  *See Maeda v. Kennedy Endeavors, Inc.*, 2021 WL 2582574, at *10 n.11 (D. Haw. June 23, 2021) (citing *Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008)) ("A non-movant's failure to oppose an issue presented in a motion generally

constitutes a waiver."). The Court therefore GRANTS IW's Motion to Strike and Exclude, and excludes Anderson's report and opinion under Rules 26 and 37. However, even assuming *arguendo* that the manifold violations of Rule 26 were justified or harmless, the Court also concludes below that Anderson's report is unreliable under Rule 702.

### 2.    Reliability of Anderson Report

Reliability precepts under *Daubert* require the district court to "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). Having reviewed Anderson's report and deposition testimony, the Court concludes that Anderson's report does not meet the reliability requirements necessary to satisfy the *Daubert* standard in this case. The Court makes this determination in part due to Anderson's failure to cite to, list, or recall the underlying facts and data he relied on to reach the conclusions from his report, as detailed *supra* pp. 18–22.

The Court also concludes that the report is unreliable because Anderson admitted several times over the course of his deposition that his conclusions constituted speculation. For example, after providing his opinion that it was a "mistake for companies for the long term to keep closing offices and think that people can work remote," Anderson opined that perhaps IW closed its Hawaiʻi

23

office in 2019 because "they were thinking about getting out of Hawaiʻi."  ECF

No. 31-5 at 191-92.  When asked for the basis of this statement, Anderson

conceded he was "wildly speculating."  *Id*. at 192.  Anderson's report characterized

sales representatives as a "unique breed of employee in the printing industry," in

that they rarely start and end their careers with the same company, and they "do

not like to deal with quality or delivery issues."  ECF No. 31-4 at 4.  When counsel

inquired into the basis for this opinion, Anderson at first answered it was formed

from "studies or surveys" as well as his own "ruminations."  ECF  No. 31-5 at 134.

When pressed on the particular surveys or studies he used, however, Anderson

backpedaled, stating "none that I can name to you," and finally answered he had

"probably not" relied on any surveys or studies at all—leaving only his

"ruminations" as the basis for this opinion.  *Id*. at 135.

  Anderson also opined that it was doubtful "there would have been any

interest in" IW's Hawaiʻi operation—when asked for the basis of this opinion, he

insisted "my opinion and belief" with no ability to cite to facts, studies, or other

data underlying his opinion.  *Id*. at 200–01.  Anderson finally declared that "in a

declining mode, to sell off a few sales reps would have been very, very hard to do."

*Id*. at 209.  The following exchange occurred:

  Q. That's speculation in this case, isn't it?

  [Counsel objects.]

A. It's what I deal with every day.

Q. Speculation is what you deal with every day?

A. Yes.

*Id.* at 209.  As a result of these exchanges, along with the report's omissions of underlying factual data, the Court harbors serious doubts regarding the reliability of any portion of Anderson's report, as well as the testimony that would flow from it.  District courts are instructed to focus "not [on] what the expert say, but what basis they have for saying it."  *Grodzitsky*, 957 F.3d at 984–85.  Anderson's report and deposition testimony leave the Court guessing as to the facts, data, and overall basis for his opinions.  Under Rule 702 and *Daubert*, the Court must screen unreliable expert opinions.  *See Alaska Rent-A-Car*, 738 F.3d at 969.  The Court therefore GRANTS IW's Motion to Strike and Exclude, and Evans will not be permitted to proffer Anderson's report or expert testimony at trial.[7]

## C.    Plaintiff's Motion to Strike Stahl Reports

IW claims Stahl's reports and testimony should not be permitted because Stahl: (1) is not qualified; (2) did not offer an opinion on the value of IW's Hawai'i

---

[7] IW alternatively requested the Court impose different sanctions if it decided not to strike Anderson's report, including payment of attorneys' fees and expenses incurred in taking Anderson's deposition and the resulting motions practice.  ECF No. 31-1 at 19 n.20.  The Court, having granted IW's Motion to Strike and Exclude, declines to impose other sanctions.  *See* Fed. R. Civ. P. 37(c)(1).

business; (3) based his report on an "improper legal opinion on the proper measure of damages"; and (4) offered unreliable opinions about what was "known or knowable" as of February 14, 2020 and about the usefulness of EBITDA.

### 1.     Qualifications

Rule 702 states that a witness may be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The rule "contemplates a broad conception of expert qualifications." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994). A proffered expert's "lack of *particularized* expertise goes to the weight accorded her testimony, not to the admissibility of her opinion as an expert." *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993).

Here, Stahl's CV indicates he has been a certified public accountant since the early 1980s. ECF No. 32-4 at 31. He has been accredited in business valuation since 1998 and certified in financial forensics since 2008. *Id.* His valuation and litigation experience includes "business damage analysis" as well as "review of business valuation for compliance with uniform standards of appraisal practice." *Id.* Based on this experience, training, and education, the Court concludes Stahl possesses the requisite qualifications. *See* Fed. R. Evid. 702. IW may develop any perceived shortcomings on the marketability portion of Stahl's opinion through cross-examination.

IW's additional arguments regarding Stahl's lack of particularized experience in two areas go to the weight rather than admissibility of his opinion. *See Garcia*, 7 F.3d at 890.  IW first proclaims that Stahl's expertise in family law disputes means "he is not qualified to testify competently about business valuation methods."  ECF No. 32-1 at 24.  Other than its unsupported opinion that family law "issues are more complex and the rules more elastic," IW offers no material differences between a valuation submitted in a family law dispute versus one submitted in business litigation.  Furthermore, IW's emphasis on Stahl's lack of experience with fairness opinions misses the mark: as far as the Court is aware, no expert in this case was retained to render a fairness opinion.  To the extent IW believes Stahl is not qualified to *remark or rely on* a 2020 fairness opinion rendered by Citigroup (a source document underlying Stahl's opinion), IW may test Stahl's understanding through cross-examination.

### 2.     Opinion on Value of IW's Hawaiʻi Business

IW also argues that Stahl's report and opinion should be excluded because he "did not offer an opinion as to the value of [IW]'s Hawaiʻi business."  ECF No. 32-1 at 11–13.  Evans insists that Stahl's lack of alternative methodology "is not a basis to exclude his testimony."  ECF No. 65 at 10–16.  The Court agrees with Evans.  Rule 26 contemplates expert testimony that is offered "solely to contradict or rebut evidence on the same subject matter identified by another party."  Fed. R.

Civ. P. 26(a)(2)(D)(ii); *see also United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1141 (9th Cir. 1999) (noting that expert was "a rebuttal witness" who highlighted certain flaws in opposing party appraisers' use of data). Furthermore, the single in-circuit case IW provides to support this argument excluded testimony of an expert who failed to "familiarize himself with the information" underlying an opposing expert's report, thus rendering the proffered testimony "close to expert testimony that amounts to simply an opinion on the credibility of another witness." *See FLIR Sys., Inc. v. Fluke Corp.*, 2012 WL 13051121, at *2 & n.1 (D. Or. Nov. 5, 2012). Having reviewed the Stahl reports and his deposition testimony, the Court harbors no doubt that Stahl thoroughly reviewed the Ultz report and is not merely offering an opinion on Ultz's credibility. Instead, Stahl seeks to contradict or undermine the methodology as well as data supporting Ultz's conclusions. Stahl's omission of an acceptable alternate methodology is not a sound basis on which to exclude his opinion or testimony.

### 3.     Improper Legal Opinion

"[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (citation omitted). IW contends that Stahl's opinions do not pass muster because "they all emanate from his improper legal opinion on the proper measure of damages." ECF No. 32-1 at 13–18.

The Court disagrees that *all* of Stahl's opinions emanate from impermissible legal conclusions.  However, Stahl opines that Ultz's approach, a business valuation "does not appropriately measure the alleged damages incurred by" IW, and that Ultz's report is deficient because it "did not perform an apportionment analysis" to address the concurrent lawsuits here and in the Florida litigation, meaning that "if [IW] were to prevail in both matters, the total due to [IW] would be $11,140,000."  ECF No. 32-5 at 29, 30.  As noted *supra* pp. 9–14, IW's damages model is acceptable and appropriate given its damages theory.  And Stahl's beliefs regarding the propriety of apportionment between this case and the Florida litigation necessarily entails an opinion about joint and several liability, indemnity, and other legal precepts Stahl is not qualified to provide.  *See Hangarter*, 373 F.3d at 1016.

The Court therefore GRANTS IW's motion in part and excludes the portion of Stahl's report that provides these impermissible legal opinions on ultimate issues of law, which are reserved for the Court.

### 4.    Other Reliability Issues

IW also takes issue with various portions of Stahl's reports to argue that his opinions and testimony are unreliable.  ECF No. 32-1 at 8, 18–23.  IW focuses on Stahl's attack on Ultz's use of HH Global's central costs and Stahl's disagreement with whether COVID-19 was known or knowable by February 14, 2020.  *Id*.  After

reviewing Stahl's report and deposition testimony on these topics, the Court concludes these perceived shortcomings go to the impeachability of Stahl's opinions rather than their admissibility or reliability.  *See Alaska Rent-A-Car*, 738 F.3d at 969.  The fact that Ultz used a permissible substitute for IW's central support costs in his calculation of EBITDA does not mean Stahl cannot attack the precision or accuracy of using a substitute where the original data may have yielded a different outcome.  Nor does Stahl's disagreement with a well-known valuator about the correct known or knowable date at which COVID-19 impacted business valuations render his report unreliable—Stahl cited to public sources to support his disagreement.  *See* ECF No. 32-5 at 29.  As mentioned, the Court's *Daubert* task requires "analyzing not what the experts say, but what basis they have for saying it."  *Grodzitsky*, 957 F.3d at 984–85.  Stahl's opinions on these topics have a reliable basis and IW may cross-examine Stahl on such subjects during trial.  The Court DENIES the remainder of IW's Motion to Strike Stahl's report or testimony.

**D.      Divisibility of Damages and Apportionment**

Having reviewed the parties' supplemental briefs, the Court defers the questions surrounding joint and several liability, divisibility of damages, and apportionment.  *See* ECF No. 88 at 24–29; ECF No. 89 at 15–17.  It appears the parties agree that IW's damages claims are indivisible, but otherwise the parties

30

argue past each other: Evans speculates about potential double-recovery issues that could result from separate awards here and in Florida, while IW maintains that the Court should not preemptively require apportionment. The Court considers these issues premature to the extent they relate to topics outside the *Daubert* motions. No damages awards have been entered by this Court, and whether apportionment becomes necessary—or "the very real possibility" of double recovery actually comes to be—are questions for another day. ECF No. 89 at 17. The Court expects the parties will file motions in limine to better focus these issues in the context of trial if needed, and it does not take any action on the issues of joint and several liability or apportionment except as it relates to the striking and/or exclusion of any expert report, as addressed above.

## IV.    CONCLUSION

For the reasons stated, the Court GRANTS IW's Motion to Strike and Exclude, ECF No. 31, GRANTS in part and DENIES in part IW's Motion to Exclude, ECF No. 32, and DENIES Evans' Motion to Exclude, ECF No. 46, as follows:

1.    IW's Motion to Strike and Exclude Expert Testimony of James A. Anderson (ECF No. 31) is GRANTED.

2.    IW's Motion to Exclude Expert Testimony of Briggs Stahl (ECF No. 32) is GRANTED in part and DENIED in part:

    a.  The Motion is GRANTED with respect to Stahl's opinions on the propriety of a business valuation as a proper measure of damages and the need for apportionment of damages.

    b.  The Motion is otherwise DENIED.

3.    Evans' Motion to Exclude Expert Opinion of Jesse A. Ultz (ECF No. 46) is DENIED.

IT IS SO ORDERED.

DATED: Honolulu, Hawaiʻi, February 14, 2024.

Jill A. Otake
United States District Judge

CIV. NO. 22-00062 JAO, *HH Associates U.S., Inc. v. Evans*; Order Granting Plaintiff's Motion to Strike and Exclude (ECF No. 31), Granting in Part and Denying in Part Plaintiff's Motion to Exclude (ECF No. 32), and Denying Defendant's Motion to Exclude (ECF No. 46)